

**EXHIBIT**

**A**

## MANAGED CARE AGREEMENT

This Managed Care Agreement ("Agreement") is made and entered into by and between Aetna U.S. Healthcare of North Texas Inc., on behalf of itself and its Affiliates (as defined below) (hereinafter "Company"), and Methodist Hospitals of Dallas d/b/a Methodist Medical Center and Charlton Methodist Hospital, a Texas non-profit corporation ("Hospital").

**WHEREAS**, Company contracts with certain health care providers and facilities to provide services within the scope of their licensure or accreditation to persons entitled to receive health care services through health benefit plans under contract with Company;

**WHEREAS**, Company has arranged with physicians under contract with Company to participate in Company's Plans;

**WHEREAS**, Company wishes to utilize the services of Hospital in connection with the provision of the aforesaid services and Hospital is willing to provide such services; and

**WHEREAS**, Company and Hospital mutually desire to preserve and enhance patient dignity;

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants, promises and undertakings herein and intending to be legally bound hereby, the parties agree as follows:

## 1.0 HOSPITAL SERVICES

1.1 Provision of Services. Hospital agrees to render to Members hospital care, facilities, equipment and services which are Covered Services under Members' Plans ("Hospital Services"). Such Hospital Services shall be comprised generally of all of the services, facilities and equipment available from Hospital which are Covered Services ordered by the physician treating the Member or rendered to a Member in an emergency. Hospital Services covered under this Agreement include, but are not limited to, the services listed in the Services and Compensation Schedule, attached hereto and made a part hereof. Company and Hospital may mutually agree in writing at any time, and from time to time, either to increase or decrease the facilities, equipment and Hospital Services made available hereunder.

1.2 Non-Discrimination. Hospital shall provide Hospital Services to Members with at least the same degree of care and skill as customarily provided to Hospital's patients who are not Members, in accordance with generally accepted standards of hospital practice and the terms of this Agreement. Hospital shall not discriminate against Members on the basis of race, gender, creed, ancestry, lawful occupation, age, religion, marital status, sexual orientation, mental or physical disability, color, national origin, place of residence, health status, source of payment for services, cost or extent of Covered Services required, or any other grounds prohibited by law in this Agreement.

1.3 Hospital Medical Staff. Hospital will provide to Company upon Company's request a list of all Hospital-based Physicians that are members of the medical staff. If Hospital maintains an open medical staff as to some or all departments, then at the request of Company and/or Physician, Hospital shall consider applications for medical staff membership by Participating Providers who meet Hospital's requirements for medical staff membership.

1.4 Notice of Adverse Actions Involving Medical Staff. To the extent neither prohibited by law nor violative of applicable privilege, Hospital agrees to provide notice to Company of, and shall provide all information reasonably requested by Company regarding the nature, circumstances, and disposition of any actions taken by Hospital adversely affecting medical staff membership of Participating Physicians and other Participating ProvidersThe previous sentence does not apply to any actions taken by Hospital which are not otherwise

TXNORT\MCA 3 (2/00)
05002020
DMCA010

Page 1 of 16

Version: 12/19/00
V.3.0.5.00

relevant to Member care (e.g., administrative violations of hospital by-laws involving medical records). Hospital agrees to use best efforts to provide prior notice of, and in any event, will provide as soon as reasonably practicable, notice of, any action taken by Hospital described in this section 1.4.

## 2.0 REPRESENTATIONS

2.1 Hospital Representation. Hospital represents and warrants that: (a) it is, and shall remain during the term of this Agreement, (i) accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") or the Bureau of Hospitals of the American Osteopathic Association, or (ii) certified to participate in the Medicare program; with such accreditation or participation applicable to all Hospital Services; (b) it is, and shall remain throughout the term of this Agreement, in compliance with all applicable federal and state laws and regulations related to this Agreement and the services to be provided hereunder, including, without limitation, statutes and regulations related to fraud, abuse, discrimination, disabilities, confidentiality, false claims and prohibition of kickbacks; (c) all hospital-based physicians who treat Members are properly credentialed, privileged, and re-appointed within the scope of their specialty; (d) this Agreement has been executed by its duly authorized representative; and (e) executing and performing its obligations hereunder shall not cause Hospital to violate any term or covenant of any other agreement or arrangement now existing or hereinafter executed.

2.2 Qualified Personnel. Hospital represents and warrants that all ancillary health care personnel employed by, or contracted with Hospital who treat Members: (a) are and shall remain throughout the term of this Agreement appropriately licensed and/or certified and supervised (when and as required by state law), and qualified by education, training and experience to perform their professional duties; and (b) shall act within the scope of their licensure or certification, as the case may be. Hospital further represents that Hospital's credentialing, privileging, and re-appointment procedures are in accordance with its medical staffs by-laws, regulations, and policies, comply with JCAHO standards, meet with the querying and reporting requirements of the National Practitioner Data Bank, and fulfill all applicable state and federal standards. Hospital acknowledges and agrees that all Medicare-required provisions of this Agreement shall apply to any subcontractors, and Hospital agrees to take all steps necessary to cause subcontractors to comply with and perform such Medicare requirements.

## 3.0 HOSPITAL COMPENSATION

3.1 Payment. Company shall, or when not the applicable Payor shall notify Payors to, pay Hospital for Hospital Services rendered to Members in accordance with the rates set forth in the Compensation Schedule, attached hereto and made a part hereof (less any applicable Copayments, Coinsurance or Deductibles which Hospital shall collect from Members), within forty-five (45) days of receipt of a Clean Claim. Payments for non-capitated Covered Services are subject to any and all valid and applicable laws related to claims payment. Except for capitated services, in the event Company or Payor fails to pay each Clean Claim within forty five (45) days of submission, , Company or Payor shall pay a contracted penalty, without notice from Hospital, of one percent and a half (1.5%) per month simple interest on the eligible, unpaid portion of such Clean Claim(s), beginning on the 46th day after submission of that Clean Claim through the date on which payment is made. For claims paid beyond forty-five (45) days of receipt and no contracted penalty was applied, Hospital shall notify Company for the additional payment of contracted reimbursement and/or contracted penalty. For claims with a date of service beginning January 1, 2001 to January 18, 2001, Hospital will not expect the contracted penalty from Company or Payors for claims not paid according to January 1, 2001 contracted reimbursement. Hospital shall not be entitled to billed charges for any Clean Claim . Hospital shall not be entitled to receive billed charges for claims under self-funded Plans. Notwithstanding the foregoing, Company shall, or when not the applicable Payor shall notify Payors to, pay for only those Hospital Services for which the requirements of sections 4.1 and 4.2 were met. Hospital shall accept compensation in accordance with the Compensation Schedule as payment in full for Hospital Services, and shall make no additional charge to Payors or Members for such services. Hospital will not seek payment from Members for Emergency Services beyond the applicable emergency room copayment under the Member's Plan. Company agrees to make reasonable effort to resolve claims payment issues in a timely manner, including but not limited to conducting periodic meetings and development of claims resolution

implementation plans.__ Any request by Company for refund of overpayment or request by Hospital for additional payment due to underpayments must be made in writing to the other party within three hundred sixty-five (365) days of the date payment was received by Hospital. Other payments to Hospital shall not be reduced to recover any refund of overpayments. After expiration of this three hundred sixty-five (365) day period, the payment shall be considered final.

3.2 Billing of Members. Under certain Plans, Members may be required to pay Copayments, Coinsurance or Deductibles for certain Covered Services. Hospital shall collect any applicable Copayments, Coinsurance and Deductibles from Members. Such amounts collected must be based only on the compensation herein. Copayments shall be collected at the time that Covered Services are rendered. Except for applicable Copayments, Coinsurance and Deductibles, Hospital may bill Members only in the circumstances described below.

3.2.1 If the applicable Payor is not a health maintenance organization ("HMO"), Hospital may bill a Member for Hospital Services provided to the Member in the event that the Payor becomes insolvent or otherwise breaches the terms and conditions of its agreement to pay, provided that: (a) Hospital shall have first exhausted all reasonable efforts to obtain payment from the Payor; and (b) Hospital shall not institute or maintain any collection activities or proceed with any action at law or in equity against a Member to collect any sums that are owed by a Payor to Hospital unless Hospital provides at least thirty (30) days prior notice to Company of Hospital's intent to institute such an action.

3.2.2 Subject to Company's rules, policies and procedures, services that are not Covered Services may be billed to Members by Hospital only if: (a) the Member's Plan provides and/or Company confirms that the services are not covered; (b) the Member was advised in writing prior to the services being rendered that certain services may not be Covered Services; and (c) the Member agreed in writing to pay for such services.

Nothing in this section is intended to prohibit or restrict Hospital from billing individuals who were not Members at the time that services were rendered.

3.3 Coordination of Benefits. When a Payor is the primary payor under applicable coordination of benefit principles, the Payor shall pay in accordance with this Agreement, and when a Payor is secondary under said principles, Payor's payment shall be limited as specified in the applicable Plan. If the Plan fails to specify coordination of benefits requirements, and unless prohibited by applicable law, Payor's payment shall be limited to the amount which, together with the amount remitted by the primary payor following all reasonable efforts by Hospital to collect same, equals the compensation due to Hospital under this Agreement, or if the primary payor fails to pay, Payor's payment shall be in accordance with this Agreement.

3.4 Company's Obligation to Pay. Company shall have no obligation to pay Hospital for Hospital Services in the event that a Payor or Member fails to pay Hospital, except where Company is the underwriter of the applicable Plan.

3.5 Claims Submission. Hospital shall bill Company or the applicable Payor for Hospital Services rendered to Members according to the terms of this Agreement. Billings shall include detailed and descriptive medical and patient data and identifying information on UB-92 forms or any subsequent form adopted for that purpose. Hospital shall make best efforts to submit bills electronically when electronic remittance is acceptable. Where material changes in Company's electronic claims submission process affects Hospital's ability to comply with the terms and conditions of this Section 3.5, Hospital and Company shall make best efforts to achieve an acceptable alternative means for claims submission. Company on behalf of the applicable Payor shall have and reserve the right to rebundle to the primary procedure those services considered part of, incidental to, or inclusive of the primary procedure. In performing rebundling, Company utilizes a commercial software package (as modified by Company for all Participating Providers in the ordinary course of Company's business) which commercial software package is based upon Medicare standards for rebundling. Hospital agrees to submit claims within ninety (90) days from the date of service, or in those instances in which the Payor is the secondary Payor, Hospital agrees to submit claims within

ninety (90) days from the date notice of payment is received from the primary payor. Any adjustments to claims submitted by Hospital must be filed within ninety (90) days of receipt of the original claim by Company or the applicable Payor, or the original claim will be deemed final. In no event shall Payors be obligated to make payment pursuant to billings received more than one (1) year from the date of service, except if Hospital notifies Company and the applicable Payor within such one (1) year period that a claim for such services has been submitted to another payor pursuant to a coordination of benefits arrangement. The one year period shall not apply to Medicare claims originally submitted to HCFA. If Hospital does not bill Company or Payors timely as stated in the preceding sentence, Hospital's claim for payment shall be deemed waived and Hospital shall not seek payment from Payors, Company, Members or Sponsors.

3.6 Holding Members Harmless. If the applicable Payor is an HMO, Hospital hereby agrees that in no event, including, but not limited to, non-payment by the HMO, insolvency of the HMO or breach of this Agreement, shall Hospital bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against Members or persons acting on their behalf (other than the HMO) for Covered Services. This provision shall not prohibit collection of Copayments, Coinsurance, Deductibles or other supplemental charges made in accordance with the terms of the applicable Plan.

Hospital further agrees that: (a) this provision shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed for the benefit of Members; and (b) this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Hospital and Members or persons acting on their behalf.

Any modifications, additions, deletions to the provisions of this clause shall become effective on a date no earlier than 15 days after the Commissioner of Insurance has received written notice of such proposed changes.

## 4.0 COMPLIANCE WITH COMPANY RULES, POLICIES AND PROCEDURES

4.1 Compliance and Participation. Hospital shall make best efforts to cooperate fully with the rules, policies and procedures that Company has established or will establish, including, but not limited to, those regarding: (a) quality improvement/management; (b) utilization management, including, but not limited to, precertification of elective admissions and procedures, and referral process or protocols; (c) claims payment review; (d) Member grievances; (e) provider credentialing; and (f) electronic submission of claims and other data required by Company. Hospital shall make best efforts to cooperate fully with and abide by any applicable Participation Criteria for outpatient services, as set forth in the Participation Criteria Schedules attached hereto and made a part hereof. Members shall be admitted to Hospital in accordance with Company's admission policies as outlined in the Hospital Procedure Manual (as modified from time to time), a copy of which will be provided to Hospital, and on the same basis as that of all other Hospital patients. Except when a Member requires Emergency Services, Hospital shall make best efforts to cooperate with any applicable precertification and/or referral requirements under the Member's Plan prior to the provision of Hospital Services. Hospital shall notify Company of all admissions of Members, and of all services for which Company requires notice, upon admission or prior to the provision of such services. For the purpose of pre-admission testing, Hospital shall directly provide testing or accept test results and examinations performed outside Hospital provided such tests and examinations are: (a) performed by a state licensed laboratory for laboratory tests, and a licensed physician for such other tests and examinations; and (b) performed within a time reasonably proximate to the admission. Hospital acknowledges and agrees that failure to cooperate with Company's rules, policies and procedures may adversely affect any compensation due hereunder and could lead to sanctions including, without limitation, termination of this Agreement. Company may at any time modify any Company rules, policies and procedures. Company will provide ninety (90) days prior notice of material changes in policies and procedures. In the event that Hospital reasonably believes that a material change is likely to have a material adverse financial impact upon Hospital, Hospital agrees to notify Company and the parties will negotiate in good faith an appropriate amendment, if any, to this Agreement.

4.2 Utilization Review. Company utilizes systems of utilization review/quality improvement/peer review consistent with applicable federal and state laws to promote adherence to accepted medical treatment

standards and to encourage Participating Providers to control medical costs consistent with sound medical treatment. To this end, Hospital agrees:

a. To participate, as requested, and to cooperate with Company's utilization review, patient management, quality improvement programs, and all other related programs (as modified from time to time) and decisions with respect to all Members. As required by Texas law, Company conducts quality assessment through a panel of at least three (3) Participating Physicians.

b. To provide facsimile or telephonic notice to Company of all emergent or urgent inpatient admissions of Members on the next business day following such admission, and of all other admissions and services for which Company requires notice, upon admission or prior to the provision of such services on the next business day following such admissions.

c. To provide clinical data and information to Company as is necessary to permit Company to conduct utilization review.

d. To permit a Company home care coordinator to assist in on-site assessments of Members for purposes of discharge planning.

e. To allow Company to conduct concurrent on-site review.

f. To provide upon Company's request complete copies of Members' medical records.

g. Company shall not retroactively deny or downgrade an inpatient day that had been previously certified for authorized services provided the information relied upon by Company to authorize services has not changed. For the purposes of this section, a certification means an approval for services given to Hospital by an appropriate Company nurse or Medical Director for that specific day. This provision is not intended to obligate Company to reimburse Hospital for services provided to Members who are later determined to have been ineligible at the time of service.

Noncompliance with any requirements of this section 4.2 may relieve both Payors and Members from any financial liability for all or any portion of the admission.

4.3 Grievances. Hospital shall use best efforts to cooperate with and participate in Company's applicable appeal, grievance and external review procedures (including, but not limited to, Medicare appeals and expedited appeals procedures, shall provide Company with the information necessary to resolve same, and shall abide by decisions of the applicable appeals, grievance and review committees. As required by State law, Provider shall post in provider's office a notice to enrollees on the process for resolving complaints with Company including the Department of Insurance toll-free telephone number for filing complaints. Company shall not terminate or refuse to renew this Agreement or otherwise retaliate against Hospital because Hospital reasonably filed a complaint or an appeal on behalf of a Member. Company will provide ninety (90) days prior notice of material changes in these procedures.

4.4 Notices and Reporting. To the extent neither prohibited by law nor violative of applicable privilege, Hospital shall provide notice to Company of, and shall provide all information requested by Company regarding the nature, circumstances, and disposition of: (a) any judgement brought against Hospital or any of its employees, medical staff members or affiliated providers which is related to the provision of health care services; and (b) any action taken by JCAHO or any government agency or program against or involving Hospital or any of its employees, medical staff members or affiliated providers that does or could adversely affect Hospital's JCAHO accreditation status, licensure, or certification to participate in the Medicare or Medicaid programs. In addition, Hospital shall provide notice to Company of: (i) the existing ownership and management of Hospital and any change in the ownership or management of Hospital; (ii) any material change in services provided by Hospital or licensure status related to such services. Hospital agrees to use best efforts to provide Company with prior notice of, and in any event, will provide as soon as reasonably practicable notice of, any actions taken by Hospital described in this section 4.4.

4.5 Assignments of Benefits and Consents to Release of Medical Information. Hospital shall obtain from all non-HMO Members to whom Hospital Services are provided: (a) signed assignments of benefits authorizing payment for Hospital Services to be made directly to Hospital; and (b) consents to the release of medical information to Company, Payors and their agents and representatives.

4.6 Accreditation and Review Activities. Hospital shall implement all activities reasonably necessary to assist Company to obtain external accreditation by the National Committee for Quality Assurance or any other similar organization selected by Company, including, but not limited to, cooperating in the auditing of Members' medical records. Hospital further agrees to fully cooperate with any review of Company or a Plan conducted by a state or federal agency with authority over Company and/or the Plan, as applicable.

4.7 Proprietary and Confidential Information. Hospital agrees that the Proprietary Information is the exclusive property of Company or a third party Payor and that Hospital has no right, title or interest in the same. Hospital shall keep the Proprietary Information and this Agreement strictly confidential and shall not disclose any Proprietary Information or the contents of this Agreement to any third party, except to federal, state and local governmental authorities having jurisdiction or as otherwise directed by Company. Hospital shall not use any Proprietary Information, and shall, at the request of Company, return any Proprietary Information and any copies or abstracts thereof, upon termination of this Agreement for whatever reason. In the event of a breach or a threatened breach of this section by Hospital, Company shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, and such rights and remedies shall be cumulative. This section shall survive the termination of this Agreement, regardless of the cause of termination.

4.8 Encounter Data. Hospital shall provide Company with encounter data by type of Covered Service rendered to Members in the form of a UB-92 submitted by Hospital to Company for the purposes of claims payment. Hospital certifies that such encounter data is truthful and complete.

## 5.0 INSURANCE

5.1 Hospital's Insurance. Hospital at its sole cost and expense shall procure and maintain such policies of general and professional liability and other insurance, including the program of self-insurance, as shall be necessary to insure it and its employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of services pursuant to this Agreement. During the entire term of this Agreement, Hospital shall maintain such insurance at minimum levels required from time to time by Company, but in no event less than: (a) professional liability insurance at a minimum level of $10,000,000 per claim/$25,000,000 annual aggregate; (b) comprehensive general liability insurance at a minimum level of $1,000,000 per claim/$3,000,000 annual aggregate; and (c) director and officer liability coverage for Hospital's directors, officers, trustees and managers in the minimum amount of $5,000,000. Such insurance coverage shall cover the acts and omissions of Hospital as well as those of Hospital's agents and employees. Memorandum copies of such policies shall be delivered to Company upon request. Hospital shall provide to Company at least thirty (30) days advance notice of any cancellation or material modification of said policies except that in the event that Hospital is not given thirty (30) days advance notice of such events, Hospital shall notify Company as soon as reasonably possible after notification of such a change to said policies.

5.2 Company's Insurance. Company at its sole cost and expense shall procure and maintain such policies of general and/or professional liability and other insurance (or a self insured program) as shall be necessary to insure Company and its employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the performance of any service by Company and the activities performed by Company in connection with this Agreement.

## 6.0 INSPECTION OF RECORDS AND DATA ACCESS

6.1 Inspection of Records and Data Access. Subject to applicable confidentiality laws and appropriate patient authorization Hospital agrees that Company, on behalf of itself and on behalf of its Affiliates, shall have access to all data and information obtained, created, or collected by Hospital related to covered services rendered to Members ("Information"). Such Information shall be owned by Hospital, and Hospital shall not enter into any contract or arrangement whereby Company or its Affiliates do not have unlimited and equal access to the Information in electronic or other form. Information shall not be directly or indirectly provided by Hospital to any competitor of Company or Company's Affiliates. Nothing in this section shall be construed as to prohibit Hospital from sharing coordination of benefit information in the normal course of business, when one or more payers are responsible for payment. Any and all information and data provided to Hospital by Company or at Company's direction shall remain the sole and exclusive property of Company and shall not be disclosed by Hospital to any third party.

6.2 Confidentiality of Medical Records. Hospital and Company agree that all Member medical records shall be treated as confidential so as to comply with all state and federal laws regarding, among other things, the confidentiality of patient records. According to the terms of Company's HMO enrollment forms, agreements with Members and applicable law, Company is authorized to obtain Information from Hospital without additional written release by the Member. Company shall have the right upon request to inspect at all reasonable times any individual Member's accounting, administrative, and medical records maintained by Hospital pertaining to this Agreement.

6.3 Provision of Records. Hospital agrees to provide Company and federal, state, and local governmental authorities having jurisdiction, upon request, access to all books, records and other papers (including, but not limited to, medical and financial records) and information relating to this Agreement and to those services rendered by Hospital to Members, and to maintain such books, records, papers and Information for the period required by applicable state law. All requested Information shall be supplied within fourteen (14) days of the receipt of the request, where practicable.

6.4 Medical Records. Hospital shall maintain Information in a current, detailed, organized and comprehensive manner and in accordance with customary medical practice, applicable state and federal laws, and accreditation standards. Medical records of Members shall include reports from referred and/or referring providers, discharge summaries, records of emergency care received by the Member and such other information as Company requires. Hospital shall make these records available to: (a) Company or its agents or designees for the purpose of assessing quality of care, conducting medical evaluations and audits, and determining, on a concurrent or retrospective basis, the medical necessity and appropriateness of care provided to Members. Company shall reimburse Hospital $20 for the first 20 pages and $0.25 per page thereafter not to exceed $75.00 per medical record to cover copying, handling and mailing costs. Company shall not be required to reimburse hospital for medical records submitted by Hospital for an appeal or request for claim recalculation; and (b) applicable state and federal authorities and their agents involved in assessing the quality of care or investigating Member grievances or complaints.

6.5 Survival. These data access and records provisions shall survive the termination of this Agreement regardless of the cause giving rise to the termination.

6.6 Government Access to Records. Until the expiration of four (4) years after the furnishing of services under this Agreement, Hospital shall make available upon request by the Secretary, U.S. Department of Health and Human Services, the U.S. Comptroller General, and their duly authorized representatives, this Agreement and all other books, documents and records that are necessary to certify the nature and extent of costs incurred by Hospital in furnishing services under this Agreement. If Hospital carries out any of its duties through a subcontract with a value or cost of ten thousand dollars ($10,000) or more over a twelve (12) month period, with a related organization, such subcontract shall contain a clause permitting access to the subcontractor's contract, books, documents and records to the parties listed above until the expiration of four (4) years after the furnishing of services pursuant to the subcontract.

## 7.0 TERM AND TERMINATION

7.1 <u>Term</u>. This Agreement shall be effective for an initial term of two (2) year(s) from January 1, 2001, and thereafter shall automatically renew for additional terms of one (1) year each, unless and until terminated in accordance with this article 7.0. Prior to termination under 7.2 or 7.3, Company shall provide a written explanation of the reasons for termination, and upon request before the effective date, Hospital shall be entitled to a review by an advisory panel and a copy of the advisory panel's recommendation and the Company's determination.

7.2 <u>Termination without Cause</u>. This Agreement may be terminated by either party at any time without cause upon at least one hundred twenty (120) days prior written notice to the other party, and in accordance with such procedures as are applicable at the time of such termination; provided, however, that no termination of this Agreement pursuant to this section 7.2 shall be effective during the first year of the initial term hereof.

7.3 <u>Termination for Breach</u>. This Agreement may be terminated at any time by either party upon at least thirty (30) days prior written notice of such termination to the other party upon default or breach by such party of one or more of its obligations hereunder, unless such default or breach is cured within thirty (30) days of the notice of termination. For example, Company's failure to pay claims according to Section 3.1.

7.4 <u>Immediate Termination or Suspension</u>. Any of the following events shall result in the immediate termination or suspension of this Agreement by Company, upon notice to Hospital, at Company's sole discretion at any time: (a) the withdrawal, expiration or non-renewal of any state or local license, certificate, approval or authorization of Hospital; (b) the bankruptcy or receivership of Hospital, or an assignment by Hospital for the benefit of creditors; (c) the loss or limitation of Hospital's liability insurance; (d) a determination by Company that Hospital's continued participation in its Plans could result in harm to Members; (e) the debarment or suspension of Hospital from participation in any governmental sponsored program, including, but not limited to, Medicare or Medicaid; (f) the indictment or conviction of Hospital for any crime; (g) the revocation or suspension of Hospital's accreditation by JCAHO or the Bureau of Hospitals of the American Osteopathic Association. Hospital shall provide immediate notice to Company of any of the aforesaid events.

7.5 <u>Obligations Following Termination</u>. Following the effective date of any termination of this Agreement or any Plan, Hospital shall comply with the following obligations. This section shall supersede any contrary agreements now existing and shall survive the termination of this Agreement, regardless of the cause of termination.

7.5.1 <u>Upon Termination</u>. Upon termination of this Agreement for any reason, other than termination by Company in accordance with section 7.4 above, Hospital shall remain obligated at Company's sole discretion to provide Hospital Services to: (a) any Member who is an inpatient at Hospital as of the effective date of termination until such Member's discharge or Company's orderly transition of such Member's care to another provider; and (b) any Member upon request of such Member or the applicable Payor, until the anniversary date of such Member's respective Plan or for one (1) calendar year, whichever is less with the written consent of Hospital. Company shall reimburse Hospital for Covered Services to any Member of special circumstance, such as a person who has a disability, acute condition, or life-threatening illness or is past the twenty-fourth week of pregnancy. "Special circumstances" means a condition such that Hospital reasonably believes that discontinuing care by the Hospital could cause harm to the patient. The special circumstance shall be identified by the Hospital, who must request that the enrollee be permitted to continue treatment under the Hospital's care and agree not to seek payment from the patient of any amounts for which the enrollee would not be responsible if the Hospital were still a Participating Hospital. This subsection does not extend the obligation of Company to reimburse the terminated Hospital for ongoing treatment of a Member beyond the 90th day after the effective date of termination, or beyond nine months in the case of an enrollee who at the time of the termination has been diagnosed with a terminal illness, except that the obligation to reimburse a Member who at the time of the termination is past the 24th week of pregnancy, extends through delivery of the child, immediate postpartum care, and the follow-up checkup within the first six weeks of delivery. The terms of this Agreement shall apply to such

services.

7.5.2 <u>Upon Insolvency or Cessation of Operations</u>. If this Agreement terminates as a result of insolvency or cessation of operations of a Company Affiliate that is an HMO, and as to Members of HMOs that become insolvent or cease operations, then in addition to other obligations set forth in this section, Hospital shall continue to provide Hospital Services to: (a) all Members for the period for which premium has been paid; and (b) Members confined as inpatients in Hospital on the date of insolvency or other cessation of operations until medically appropriate discharge. This provision shall be construed to be for the benefit of Members. No modification of this provision shall be effective without the prior written approval of the applicable regulatory agencies.

7.5.3 <u>Obligation to Cooperate</u>. Upon notice of termination of this Agreement or of a Plan, Hospital shall cooperate fully with Company and comply with Company procedures, if any, in the transfer of Members to other providers. Upon notice of termination of this Agreement or of a Plan, Hospital, upon the direction of Company, shall provide reasonable advance notice of the impending termination to Members currently under the treatment of Hospital.

## 8.0 MODIFICATIONS

8.1 <u>Amendments</u>. This Agreement constitutes the entire understanding of the parties hereto and no changes, amendments or alterations shall be effective unless signed by both parties, except as expressly provided herein. Notwithstanding the foregoing, at Company's discretion, Company may amend this Agreement upon written notice to Hospital to comply with applicable law or regulation, or any order or directive of any governmental agency. Hospital reserves the right to question if Amendment is applicable to law regulation, or directive of any governmental agency.

8.2 <u>Plan Participation</u>. Hospital shall be designated as a Participating Provider in all commercial based Plans (defined by the Plans offered as of the effective date of this Agreement under HMO Based Plan and non HMO Plan definitions, excluding Medicare, Medicaid, Workers Compensation, indemnity) identified in the Services and Compensation Schedules attached to this Agreement. Hospital agrees that it will provide Hospital Services to Members of such Plans, including those from other service areas in the same or similar product lines, in accordance with the terms of this Agreement. Company reserves the right to introduce new Plans during the course of this Agreement. Hospital and Company must mutually agree, in writing, on the terms and condition under which Hospital shall become a Participating Provider in Plan's not listed in the attached Services and Compensation Schedules.

## 9.0 RELATIONSHIP OF THE PARTIES

9.1 <u>Independent Contractor Status</u>. The relationship between Company and Hospital, as well as their respective employees and agents, is that of independent contractors, and neither shall be considered an agent or representative of the other party for any purpose, nor shall either hold itself out to be an agent or representative of the other for any purpose. Company and Hospital will each be solely liable for its own activities and those of its agents and employees, and neither Company nor Hospital will be liable for the activities of the other party or the other party's agents or employees, including, without limitation, any liabilities, losses, damages, injunctions, suits, actions, fines, penalties, claims or demands of any kind or nature by or on behalf of any person, party or governmental authority arising out of or in connection with: (a) any failure to perform any of the agreements, terms, covenants or conditions of this Agreement; (b) any negligent act or omission or other misconduct; (c) the failure to comply with any applicable laws, rules or regulations; or (d) any accident, injury or damage. Hospital acknowledges that all Member care and related decisions are the sole responsibility of Hospital, and that Company's procedures, protocols and policies do not dictate or control Hospital's clinical decisions with respect to the care of Members. Hospital agrees to indemnify and hold harmless Company from any and all claims, liabilities and causes of action (including costs and counsel fees) arising out of Hospital's care of Members. Either party herein agrees to indemnify and hold harmless the other party, its officers, agents, and employees from and against any and all claims, damages, or attorney's fees arising out of or connected with the acts or omissions of such party, its officers, agents, or employees in connection with this Contract; unless such indemnification is prohibited by Hospital's or Company's insurers."

9.2 Use of Name. Hospital consents to the use of Hospital's name and address(s) in provider directories. All other materials and marketing literature of Company in all formats, including, but not limited to, electronic media must be approved by Hospital in writing by Hospital prior to use. Hospital shall not use Company's names, logos, trademarks or service marks in marketing materials or otherwise, except as provided in this Agreement, without Company's prior written consent. Hospital may use Company's name and description in lists and non- marketing communications to physicians with hospital privileges at Hospital, to Hospital's staff, and to the public.

9.3 Interference with Contractual Relations. Hospital shall not, in a disparaging manner: (a) counsel or advise, directly or indirectly, Payors, Sponsors or other entities currently under contract with Company or any Affiliate to cancel, modify, or not renew said contracts; (b) impede or otherwise interfere with negotiations which Company or an Affiliate is conducting for the provision of health insurance or Plans; or (c) use or disclose to any third party membership lists acquired during the term of this Agreement for the purpose of directly or indirectly soliciting individuals who were or are Members or otherwise to compete with Company or any Affiliate. Nothing in this section is intended or shall be deemed to restrict any communication between Hospital and a Member, or a party designated by a Member, determined by Hospital to be necessary or appropriate for the diagnosis and care of the Member. This section shall survive the termination of this Agreement for twelve (12) months following the termination date of this Agreement. In the event of a breach or a threatened breach of this section by Hospital, Company shall have the right of specific performance and injunctive relief in addition to any and all other remedies and rights at law or in equity, and such rights and remedies shall be cumulative.

9.4 Cooperation. Company and Hospital agree that to the extent compatible with the separate and independent management of each, they shall maintain an effective liaison and close cooperation with the goal of providing Hospital Services to Members at reasonable costs consistent with high standards of medical care. The parties shall exchange information about matters related to this common interest.

9.5 Philosophy.

9.5.1 Hospital shall not differentiate or discriminate in the treatment of, or in the access to treatment of, patients on the basis of their status as Members, or other grounds identified in the Agreement.

9.5.2 Hospital shall have the right and is encouraged to discuss with its patients pertinent details regarding the diagnosis of the patient's condition, the nature and purpose of any recommended procedure, the potential risks and benefits of any recommended treatment, and any reasonable alternatives to such treatment.

9.5.3 Hospital's obligations under the Agreement not to disclose Proprietary Information do not apply to any disclosures to a patient determined by Hospital to be necessary or appropriate for the diagnosis and care of a patient, except to the extent such disclosure would otherwise violate Hospital's legal or ethical obligations.

9.5.4 Hospital is encouraged to discuss Company's provider reimbursement methodology with Hospital's patients who are Members, subject only to Hospital's general contractual and ethical obligations not to make false or misleading statements. Accordingly, Proprietary Information does not include descriptions of the methodology under which Hospital is reimbursed, although such Proprietary Information does include the specific rates paid by Company due to their competitively sensitive nature.

## 10.0 COMPANY OBLIGATIONS AND DISPUTE RESOLUTION

10.1 Company Obligations. Company or Payors shall provide Hospital with a means to identify Members (e.g., identification cards). Identification cards shall include at a minimum the following information:

a.) Identification Cards for HMO Based Plans shall provide Member Name; Member Identification Number; Group Number, if appropriate; toll-free telephone number(s) to obtain information related to Member's Eligibility, Benefits, or to provide information related to Pre-Authorization or Certification for Covered Services; Claims Address.

b.) Identification Cards for Non HMO Plans shall provide Member Name; Member Identification Number; Group Number; Payor Identification Number; toll-free telephone number(s) to obtain information related to Member's Eligibility, Benefits, or to provide information related to Pre-Authorization or Certification for Covered Services; Claims Address.

Company shall further provide Hospital with an explanation of benefits available to Members, utilization standards, administrative requirements, a listing of physicians, hospitals and ancillary providers in Company's network, and timely notification of significant changes in this information. Company shall enable Hospital to check eligibility 24 hours a day 7 days a week through electronic or automated telephonic means. Company shall include Hospital in the applicable Participating Provider directory or directories and shall make said directories available to Members.

10.2   Dispute Resolution

10.2.1 Dispute Resolution.  Company shall provide an internal mechanism whereby Hospital may raise issues, concerns, controversies or claims regarding the obligations of the parties under this Agreement. Hospital shall utilize this internal mechanism as described in the attached Exhibit A. Dispute Resolution Procedure prior to submitting a complaint to any regulatory agency or instituting any arbitration or other permitted legal proceeding.  Discussions and negotiations held specifically pursuant to this Section 10.2.1 shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

10.2.2 Survival.  The provisions of Section 10.2 shall survive expiration or termination of this Agreement, regardless of the cause giving rise to termination.

## 11.0   MISCELLANEOUS

11.1   Waiver.  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof.  To be effective, all waivers must be in writing and signed by the party to be charged.

11.2   Governing Law.  This Agreement shall be governed in all respects by the laws of the State of Texas.

11.3   Liability.  Notwithstanding section 11.2, Company or Hospital's liability, if any, for damages to the other party for any breach related to this Agreement, and regardless of the form of the action, shall be limited to actual damages. Neither party shall be liable to the other party for any indirect, incidental, punitive, exemplary, special or consequential damages of any kind whatsoever sustained as a result of a breach of this Agreement.

11.4   Severability.  Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect in any instance shall not affect the validity, legality and enforceability of such provision in any other instance, or the validity, legality or enforceability of any other provision of this Agreement.

11.5   Assignment.  This Agreement may be assigned by Company to an Affiliate or a successor in interest.  The rights, obligations, and liabilities of Hospital will not be affected by any such assignment. Hospital shall be notified of such assignment in writing ninety (90) days prior to the effective date of such assignment.  This Agreement may not be assigned or delegated by Hospital without the prior written consent of Company or its successor.

11.6 <u>Affirmative Action</u>. Company is an Equal Opportunity Employer which maintains an Affirmative Action Program. To the extent applicable to Hospital, Hospital agrees to comply with the following, as amended from time to time: Executive Order 11246, the Vietnam Era Veterans Readjustment Act of 1974, the Drug Free Workplace Act of 1988, Section 503 of the Rehabilitation Act of 1973, Title VI of the Civil Rights Act of 1964, the Age Discrimination Act of 1975, the Americans with Disabilities Act, any similar legislation regarding transactions relating to any government contract of Company or an Affiliate, and any rules and regulations promulgated under such laws.

11.7 <u>Headings</u>. The headings contained in this Agreement are included for purposes of convenience only, and shall not affect in any way the meaning or interpretation of any of the terms or provisions of this Agreement.

11.8 <u>Notices</u>. Any notice required to be given pursuant to the terms and provisions hereof shall be effective only if given in writing and sent by overnight delivery service with proof of receipt, or by certified mail return receipt requested. Notices shall be sent to the following addresses (which may be changed by giving notice in conformity with this section):

to Hospital at:

> Methodist Hospitals of Dallas d/b/a MMC and CMH
> CEO and President
> 1441 N. Beckley Ave
> Dallas, TX 75203
> with copy to: Assistant Vice President of Managed Care

and to Company at:

> Aetna U.S. Healthcare
> Provider Contract Management
> Network Operations - WC Region
> 2777 Stemmons Freeway, #400
> Dallas, TX 75207
> With a copy to: Senior Network Manager

11.9 <u>Non-Exclusivity</u>. This Agreement is not exclusive, and nothing herein shall preclude either party from contracting with any other person or entity for any purpose. Company makes no representation or guarantee as to the number of Members who may select or be assigned to Hospital.

11.10 <u>Entire Agreement</u>. This Agreement (including any attached schedules) constitutes the complete and sole contract between the parties regarding the subject hereof and supersedes any and all prior or contemporaneous oral or written communications or proposals not expressly included herein.

11.11 <u>Delegation</u>. To the extent Company delegates certain functions to Hospital, such delegation shall be governed by a separate delegation agreement which shall be subject to the applicable requirements of Texas Insurance Code, Article 20A.18C.

## 12.0 DEFINITIONS

When used in this Agreement, all capitalized terms shall have the following meanings:

12.1 <u>Affiliate</u>. An Affiliate, with respect to Company, means any corporation, partnership or other legal entity (including any Plan) directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control, with Company.

12.2 <u>Clean Claim</u>. A complete and accurate claim submitted for a Covered Service (i) that has been completed in

accordance with the in force state standards defined in Title 28 of the Texas Administrative Code, Section 21.2803 or its successor and (ii) that is in the format of a UB-92 or its successor or a HCFA 1500 or its successor and submitted within the time frame required by Company.

12.3 Coinsurance. The percentage of the rates established under this Agreement which a Member is required to pay for Covered Services under a Plan.

12.4 Copayment. A charge required under a Plan that must be paid by a Member at the time of the provision of Covered Services.

12.5 Covered Services. Those health care services that are paid for under the applicable Plan that are not otherwise excluded or limited. The Parties agree that Company is obligated to pay for only those Covered Services as determined in accordance with the Member's applicable Plan.

12.6 Deductible. An amount that a Member must pay for Covered Services per specified period in accordance with the Member's Plan before benefits will be paid.

12.7 Emergency Services. Those services necessary to treat a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: (a) placing the health of individual (or, with respect to a pregnant woman, the health of the woman and her unborn child) in serious jeopardy; (b) serious impairment to bodily functions; or (c) serious dysfunction of any bodily organ or part; or such broader definition required by applicable law.

12.8 HMO Based Plans. Those Plans offered, issued or administered by Company or one of its licensed HMO Affiliates and which contain a gatekeeper element by which some or all care received by members in such Plans is coordinated or authorized, as the case may be, by such Member's primary health care provider. As of the Effective Date, HMO Based Plans include Company's HMO, Medicare Risk and Point of Service (including but not limited to "QPOS", "Open Access" and USAccess") products.

12.9 Hospital-based Physicians. Hospital-based Physicians shall mean any physician employed by Hospital.

12.10 Member. An individual covered by or enrolled in a Plan.

12.11 Non-HMO Plan. Those Plans offered, issued or administered by one of Company's licensed insurer, non HMO Affiliates. As of the Effective Date of this Agreement, Company Non-HMO plans include: Aetna U.S. Healthcare Elect Choice, Aetna U.S. Healthcare Managed Choice, Aetna U.S. Healthcare Open Choice and Aetna U.S. Healthcare National Advantage Plan (NAP).

12.12 Participating Provider. Any physician, hospital, skilled nursing facility, or other individual or entity involved in the delivery of health care or ancillary services who or which has entered into and continues to have a current valid contract with Company to provide Covered Services to Members, and has been credentialed by Company or its designee consistent with Company's credentialing policies. Certain categories of Participating Providers may be referred to herein more specifically as, e.g., "Participating Physicians" or "Participating Hospitals."

12.13 Payor. An employer, insurer, health maintenance organization, labor union, organization or other person or entity which has agreed to be responsible for funding benefit payments for Covered Services provided to Members under the terms of a Plan.

12.14 Plan. Any health benefit product or plan issued, administered, or serviced by Company or one of its Affiliates, including HMO, preferred provider organization, indemnity, Medicaid, Medicare as specified in the attached Services and Compensation Schedules.

12.15 <u>Proprietary Information</u>. The information developed by or belonging to Company or any third party Payor including, but not limited to, this Agreement, mailing lists, patient lists, employer lists, Company rates and procedures, product related information and structure, utilization review procedures, formats and structure and related information and documents concerning Company's systems and operations of its Plans.

12.16 <u>Sponsor</u>. An entity that has contracted with Company to issue, administer, or service a Plan. Sponsors shall include, without limitation, employer groups sponsoring or offering a self-insured Plan to their employees.

**IN WITNESS WHEREOF**, the undersigned parties have executed this Agreement, intending to be bound thereby.

**HOSPITAL**

By: _____
(Signature)

Printed Name: *HOWARD M. CHASE*

Title: *PRESIDENT AND CEO*

Date: *12/21/00*

**COMPANY**

By: _____
(Signature)

Printed Name: Charles Timothy Brown

Title: Regional Manager

Date: 12/22/00

REIMBURSEMENT ADDRESS:      PO Box 911875, Dallas, TX 75391-1875
MAIN TELEPHONE NUMBER:      214-947-4500
CHIEF EXECUTIVE OFFICER:      Howard M. Chase
CHIEF FINANCIAL OFFICER:      Michael J. Schaefer
BUSINESS OFFICE MANAGER:      R. Mack Wilson, Jr.
FEDERAL TAX I.D. NUMBER:      75-0800661



RECEIVE
'DEC 21 2000
NETWORK MANAGEMENT

**Exhibit A. Dispute Resolution Procedure**

# Pages 15-16

# REDACTED-CONFIDENTIAL

MANAGED CARE AGREEMENT
SERVICES AND COMPENSATION SCHEDULE*

# Pages 17-69

# REDACTED-
# CONFIDENTIAL

HOSPITAL SERVICES
AND
COMPENSATION SCHEDULE

INPATIENT RATES:

# Pages 1-12

# REDACTED-
# CONFIDENTIAL

## AMENDMENT

This Amendment is made as of June 1, 2009 (Effective Date), between Aetna Health Inc., a Texas corporation, on behalf of itself and its Affiliates (hereinafter referred to as "Company") and Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC and MRH, (hereinafter referred to as "Provider").

**WHEREAS,** the parties have entered into a Managed Care Agreement ("Agreement") to provide health care services to Members; and

**WHEREAS,** Provider has notified Company of a new hospital location they wish to include under the Agreement and Company has agreed to add such location subject to the terms of the Agreement; and

**WHEREAS,** the parties wish to amend the Agreement to add the separately licensed and incorporated hospital location known as MHSR Medical Center, dba Methodist Richardson Medical Center to be compensated under separate compensation terms; and

**WHEREAS,** Provider notified Company of a change to hospital locations's name and Federal Tax Identification Number and Company has agreed to amend the Agreement to incorporate such changes.

**NOW, THEREFORE,** in consideration of the mutual promises and undertakings contained herein, the parties agree to be legally bound as follows:

1.  The Hospital Services and Compensation Schedule Methodist Richardson Medical Center and the Medicare Hospital Services and Compensation Schedule Methodist Richardson Medical Center attached hereto are incorporated into the Agreement and shall apply to Covered Service provided by Methodist Richardson Medical Center.

2.  The Service and Billing Location form is hereby deleted and replaced in its entirety by the Service and Billing Location form attached hereto to include the following location(s) and to update Methodist Richardson Medical Centers' Federal Tax Identification Number to

    Methodist Richardson Medical Center
    401 West Campbell Road
    Richardson, Texas 75080

    Methodist Richardson Medical Center – Outpatient Hospital – Bush Renner Campus
    2831 East President George Bush Highway
    Richardson, Texas 75082

    Methodist Richardson Medical Center – Cancer Center – Bush Renner Campus
    2805 East President George Bush Highway
    Richardson, Texas 75082

3.  The Managed Care Agreement is hereby revised to be between Aetna Health Inc., a Texas Corporation, on behalf of itself and its Affiliates (hereinafter referred to as "Company") and Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC, MRH and MHSR Medical Center dba Methodist Richardson Medical Center "MRMC" (herein collectively referred to as "Provider").

4.  All other terms and provisions of the Agreement not amended hereby shall remain in full force and effect. In the event of any inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall govern and control.

REDACTED

**IN WITNESS WHEREOF**, the parties have caused this Amendment to be executed below.

**Accepted By:**

**PROVIDER** Methodist Hospitals of Dallas d/b/a
MDMC, MCMC, MMMC, and MRH

By _____
(Signature)

Printed Name: Tim B. Kirby

Title: Senior Vice President

Date: May 29, 2009

Tax I.D. Number: 75-0800661

**COMPANY**  **Aetna Health Inc., a Texas**
**corporation**

By: _____
(Signature)

Printed Name: **Sheila P. Ware**
**Network Vice President**

Title: **North Texas**

Date: 06/10/05

**PROVIDER** MHSR Medical Center dba
Methodist Richardson Medical
Center

By: _____
(Signature)

Printed Name: Tim B. Kirby

Title: Vice President

Date: May 29, 2009

Tax I.D. Number: 26-4193362

# Pages 1-3

# REDACTED-
# CONFIDENTIAL



**HOSPITAL SERVICES**
**AND**
**COMPENSATION SCHEDULE**

# Pages 1-29

# REDACTED-CONFIDENTIAL



Methodist Hospitals of Da.    /b/a MDMC, MCMC, MMMC;
And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital;
And MHSR Medical Center d/b/a MRMC;
And Methodist McKinney Hospital, LLC

# AMENDMENT

This Amendment (the "Amendment") is made as of <u>September 15, 2010</u> (the "Effective Date"), between Aetna Health Inc., a Texas corporation, on behalf of itself and its Affiliates (hereinafter referred to as "Company") and Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC; And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital; And MHSR Medical Center d/b/a MRMC; And Methodist McKinney Hospital, LLC (hereinafter referred to as "Provider").

**WHEREAS**, Company and Provider have entered into a Managed Care Agreement ("Agreement") to provide health care services to members enrolled in coverage plans issued or administered by Company; and

**WHEREAS**, the Parties agree to include revisions to the Agreement to comply with the Medicare Improvements for Patients and Providers Act of 2008 which included new requirements regarding balance billing by providers of certain individuals enrolled in both Medicare Advantage Plans and a State Medicaid Plan (Dual Eligibility Enrollees); and

**WHEREAS**, Company and Provider wish to revise the agreement to allow for Provider to submit written notice of location changes and location additions for which Provider has majority ownership, and

**WHEREAS**, Company and Provider wish to update language in sections 1.1, 8.2 and 11.5 of the current Agreement, and;

**WHEREAS**, Company and Provider wish to add the definition for Specialty Program to the current Agreement, and;

**WHEREAS**, Company and Provider have successfully negotiated new compensation terms of the Agreement; and

**WHEREAS**, the Parties to the Agreement wish to amend the Agreement as of the Effective Date as provided herein.

**NOW, THEREFORE**, in consideration of the mutual promises and undertakings contained herein, the parties agree to be legally bound as follows:

1.   The Hospital Services and Compensation Schedule For All Methodist Hospitals of Dallas Effective April 1, 2010 of the Agreement is hereby deleted and replaced by the Hospital Services and Compensation Schedule for All Methodist Hospitals of Dallas Effective September 15, 2010 attached hereto and made a part hereof.

2.   Section 3.2.3 is hereby added to the Agreement.

     <u>Section 3.2.3 Cost Sharing Protections for Dual Eligible Members</u> Provider acknowledges and agrees that Medicare Members who are also enrolled in a State Medicaid plan ("Dual Eligible Members") are not responsible for paying to Provider any Copayments, Coinsurance or Deductibles for Medicare Part A and Part B services ("Cost Sharing Amounts") when the State Medicaid plan is responsible for paying such Cost Sharing Amounts. Provider further agrees that they will not collect Cost Sharing Amounts from Dual Eligible Members when the State is responsible for paying such Cost Sharing Amounts, and will, instead, either accept the Company's payment for Covered Services as payment in full for Covered Services and applicable Cost Sharing Amounts, or bill the applicable State Medicaid plan for the appropriate Cost Sharing Amounts owed by the State Medicaid plan.

3.   Section 1.1of the Agreement is hereby updated to include the following:

Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC,
And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital;
And MHSR Medical Center d/b/a MRMC;
And Methodist McKinney Hospital, LLC

## AMENDMENT

This Amendment (the "Amendment") is made as of <u>September 15, 2010</u> (the "Effective Date"), between Aetna Health Inc., a Texas corporation, on behalf of itself and its Affiliates (hereinafter referred to as "Company") and Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC; And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital; And MHSR Medical Center d/b/a MRMC; And Methodist McKinney Hospital, LLC (hereinafter referred to as "Provider").

**WHEREAS,** Company and Provider have entered into a Managed Care Agreement ("Agreement") to provide health care services to members enrolled in coverage plans issued or administered by Company; and

**WHEREAS,** the Parties agree to include revisions to the Agreement to comply with the Medicare Improvements for Patients and Providers Act of 2008 which included new requirements regarding balance billing by providers of certain individuals enrolled in both Medicare Advantage Plans and a State Medicaid Plan (Dual Eligibility Enrollees); and

**WHEREAS,** Company and Provider wish to revise the agreement to allow for Provider to submit written notice of location changes and location additions for which Provider has majority ownership, and

**WHEREAS,** Company and Provider wish to update language in sections 1.1, 8.2 and 11.5 of the current Agreement, and;

**WHEREAS,** Company and Provider wish to add the definition for Specialty Program to the current Agreement, and;

**WHEREAS,** Company and Provider have successfully negotiated new compensation terms of the Agreement; and

**WHEREAS,** the Parties to the Agreement wish to amend the Agreement as of the Effective Date as provided herein.

**NOW, THEREFORE,** in consideration of the mutual promises and undertakings contained herein, the parties agree to be legally bound as follows:

1. The Hospital Services and Compensation Schedule For All Methodist Hospitals of Dallas Effective April 1, 2010 of the Agreement is hereby deleted and replaced by the Hospital Services and Compensation Schedule for All Methodist Hospitals of Dallas Effective September 15, 2010 attached hereto and made a part hereof.

2. Section 3.2.3 is hereby added to the Agreement.

   <u>Section 3.2.3 Cost Sharing Protections for Dual Eligible Members</u> Provider acknowledges and agrees that Medicare Members who are also enrolled in a State Medicaid plan ("Dual Eligible Members") are not responsible for paying to Provider any Copayments, Coinsurance or Deductibles for Medicare Part A and Part B services ("Cost Sharing Amounts") when the State Medicaid plan is responsible for paying such Cost Sharing Amounts. Provider further agrees that they will not collect Cost Sharing Amounts from Dual Eligible Members when the State is responsible for paying such Cost Sharing Amounts, and will, instead, either accept the Company's payment for Covered Services as payment in full for Covered Services and applicable Cost Sharing Amounts, or bill the applicable State Medicaid plan for the appropriate Cost Sharing Amounts owed by the State Medicaid plan.

3. Section 1.1of the Agreement is hereby updated to include the following:

Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC,
And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital;
And MHSR Medical Center d/b/a MRMC;
And Methodist McKinney Hospital, LLC

Hospital may add new facilities or delete existing locations at which it provides Covered Services upon written notice to Company. Company shall add each new facility within 120 days of receipt of Hospital's written notice and completion of any necessary contract documents. Hospital acknowledges that, within this period, such new location must satisfy Company's standard credentialing criteria, as well as provide services of the type covered under the Agreement in which Hospital has a majority ownership interest (i.e. 50% or greater).

4.  Section 8.2 of the Agreement is hereby deleted and replaced with the following:

    Product Participation. Hospital agrees to participate in the Plans and other health benefit products as described in the Product Participation Schedule. Company reserves the right, upon ninety (90) days prior notice, to introduce, modify and designate Hospital's participation in Plans, Specialty Programs and products during the term of this Agreement and will provide Hospital with written notice of such Plans, Specialty Programs and products and the associated compensation. Within thirty (30) days of receipt of notification of product introduction, Hospital may indicate its desire to discuss compensation concerns, if any.

    Nothing in this Agreement shall require that Company identify, designate or include Hospital as a preferred participant in any specific Plan, Specialty Program or product; provided, however, Hospital shall accept compensation in accordance with this Agreement for the provision of any Covered Services to Members under a Plan, Specialty Program or product in which Hospital has agreed to participate in under this Agreement. Company agrees that it will not exclude Hospital from participating in a new product if (i) Hospital can provide services as required by such new product, (ii) Hospital meets any applicable criteria established by Company for such product, and (iii) Hospital agrees to accept all terms and conditions of such new product.

    Company may sell, lease, transfer or otherwise convey to payors (other than Plan Sponsors) which do not compete with Company's product offerings (e.g., workers compensation or automobile insurers) in the geographic area where Hospital provides Covered Services, the benefits of this Agreement, including, without limitation, the Services and Compensation Schedule, under terms and conditions which will be communicated to Hospital in each such case. For those programs and products which are not health benefit products (e.g., workers compensation or auto insurance). Hospital shall have thirty (30) days from receipt of the Company's notice to notify Company in writing if Hospital elects not to participate in these products(s).

5.  The following definition is hereby added to the agreement.

    12.17 Specialty Program. A Company-established program for a targeted group of Members with certain types of illnesses, conditions or risk factors (e.g., organ transplants, women's health, other disease management programs, etc).

6.  Section 11.5 of the Agreement is hereby deleted and replaced with the following:

    Successors; Assignment. This Agreement relates solely to the provision of Hospital Services by Hospital and does not apply to any other organization which succeeds to Hospital assets, by merger, acquisition or otherwise, or is an affiliate of Hospital. Neither Party may assign its rights or delegate its duties and obligations under this Agreement without the prior written consent of the other Party, which consent may not be unreasonably withheld.

7.  All other terms and provisions of the Agreement not amended hereby shall remain in full force and effect. In the event of any inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall govern and control.

8.  This Amendment may be signed in several counterparts, each of which will be deemed an original; however, all shall constitute one and the same Amendment.

Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC,
And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital;
And MHSR Medical Center d/b/a MRMC;
And Methodist McKinney Hospital, LLC

**IN WITNESS WHEREOF,** this Amendment has been duly executed by the authorized representatives of Company and Provider as of the Effective Date.

**Accepted By:**

**PROVIDER** Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC

By: _____
(Signature)

Printed Name: Tim B. Kirby

Title: Senior Vice President

Date: 30 Aug 2010

Tax I.D. Number: 75-0800661

**COMPANY    Aetna Health Inc., a Texas corporation**

By: _____
(Signature)

Printed Name: **David M. Roberts**
**Senior Network Vice President**

Title: _____

Date: 09 | 09 | 2010

**PROVIDER** MHSR Medical Center d/b/a MRMC

By: _____
(Signature)

Printed Name: Tim B. Kirby

Title: Senior Vice President, MHS

Date: 30 Aug 2010

Tax I.D. Number: 26-4193362

**PROVIDER** MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital

By: _____
(Signature)

Printed Name: Tim B. Kirby

Title: Vice President

Date: 30 Aug 2010

Tax I.D. Number: 20-5000978

**PROVIDER** Methodist McKinney Hospital, LLC

By: _____
(Signature)

Printed Name: Tim B. Kirby

Title: Senior Vice President, MHS

Date: 30 Aug 2010

Tax I.D. Number: 20-8847736

Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC, and MRH
And MHSR Medical Center d/b/a MRMC
And Methodist McKinney Hospital, LLC

**HOSPITAL SERVICES AND
COMPENSATION SCHEDULE**
For All Methodist Hospitals of Dallas
Effective September 15, 2010

# Pages 1-12

# REDACTED-
# CONFIDENTIAL

Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC,
And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital;
And MHSR Medical Center d/b/a MRMC;
And Methodist McKinney Hospital, LLC;
And MetDalSpi, LLC d/b/a Methodist Hospital for Surgery
Effective Date: 06/01/2011

## AMENDMENT

This Amendment is made as of June 1, 2011 (Effective Date), between Aetna Health Inc., a Texas corporation, on behalf of itself and its Affiliates (hereinafter referred to as "Company") and Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC, And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital; And MHSR Medical Center d/b/a MRMC; And Methodist McKinney Hospital, LLC; And MetDalSpi, LLC d/b/a Methodist Hospital for Surgery, (hereinafter referred to as "Provider").

**WHEREAS,** the parties have entered into a Managed Care Agreement ("Agreement") to provide health care services to Members;

**WHEREAS,** Company and Provider have successfully negotiated new compensation terms of the Agreement; and

**WHEREAS,** the Parties to the Agreement wish to amend the Agreement as of the Effective Date as provided herein.

**NOW, THEREFORE,** in consideration of the mutual promises and undertakings contained herein, the parties agree to be legally bound as follows:

1. The Hospital Services and Compensation Schedule attached to the Agreement is hereby replaced by the Hospital Services and Compensation Schedule attached which has been revised to allow compensation for the following : .i products.

2. All other terms and provisions of the Agreement not amended hereby shall remain in full force and effect. In the event of any inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall govern and control.

3. This Amendment may be signed in several counterparts, each of which will be deemed an original; however, all shall constitute one and the same Amendment.

**IN WITNESS WHEREOF,** the parties have caused this Amendment to be executed below.

Accepted By:

**PROVIDER:** Methodist Hospitals of Dallas d/b/a
MDMC, MCMC, MMMC

By: _____
(Signature)

Printed Name: __Tim B. Kirby__

Title: __Senior Vice President__

Date: __15 April 2011__

Tax I.D. Number: 75-0800661

**COMPANY** Aetna Health Inc., a Texas
corporation

By: _____
(Signature)

Printed Name: __David M. Roberts__

Title: __Senior Network Vice President__

Date: __06 | 06 | 2011__

REDACTED

Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC,
And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital;
And MHSR Medical Center d/b/a MRMC;
And Methodist McKinney Hospital, LLC;
And MetDalSpi, LLC d/b/a Methodist Hospital for Surgery
Effective Date: 06/01/2011

**PROVIDER:** MHSR Medical Center d/b/a MRMC

By: _____
(Signature)

Printed Name:___Tim B. Kirby_____

Title: _____Vice President_____

Date: __15 April 2011__

Tax I.D. Number: 26-4193362

**PROVIDER:** MHS-CHC I LP d/b/a Methodist
Rehabilitation Hospital

By: _____
(Signature)

Printed Name:___Tim B. Kirby_____

Title: Senior Vice President, Methodist Health
System

Date: __15 April 2011__

Tax I.D. Number: 20-5000978

**PROVIDER:** Methodist McKinney Hospital, LLC

By: _____
(Signature)

Printed Name:___Tim B. Kirby_____

Title: Senior Vice President Methodist Health
System

Date: __15 April 2011__

Tax I.D. Number: 20-8847736

**PROVIDER:** MetDalSpi, LLC d/b/a Methodist
Hospital for Surgery

By: _____
(Signature)

Printed Name:___Tim B. Kirby_____

Title: Senior Vice President Methodist Health
System

Date: __15 April 2011__

Tax I.D. Number: 26-3195791

Methodist Hospitals of Dallas d/b/a MDMC, MCMC, MMMC,
And MHS-CHC I LP d/b/a Methodist Rehabilitation Hospital;
And MHSR Medical Center d/b/a MRMC;
And Methodist McKinney Hospital, LLC;
And MetDalSpi, LLC d/b/a Methodist Hospital for Surgery
Effective Date: 06/01/2011

**INPATIENT RATES:**

# Pages 3-14

# REDACTED-
# CONFIDENTIAL

